AO 91 (Rev. 11/82)             CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>CHAD NICHOLAS BARKER | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>ED18-MJ-85<br>FILED CLERK, U.S. DISTRICT COURT<br>MAR 12 2018<br>CENTRAL DISTRICT OF CALIFORNIA |

Complaint for violation of Title 18, United States Code, Section 1951

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE PAUL L. ABRAMS | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>December 11, 2017 | PLACE OF OFFENSE<br>San Bernardino County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 1951]

On or about December 11, 2017, in San Bernardino County, within the Central District of California, defendant CHAD NICHOLAS BARKER ("defendant") obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, in that defendant robbed the 7-11 convenience store located at 16925 Randall Ave., Fontana, California, a business that was engaged in interstate and foreign commerce and which was in an industry which affects interstate and foreign commerce, by unlawfully taking and obtaining property in the presence of victim employee S.B., against his will by means of actual and threatened force, violence, and fear of injury, immediate and future, to his person.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>/S/<br>OFFICIAL TITLE<br>Special Agent, Federal Bureau of Investigation |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[(1)]<br>PAUL L. ABRAMS | DATE<br>March 12, 2018 |
|---|---|

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSA J. Chemerinsky x6520    [REC by AUSA: Detention]

## AFFIDAVIT

I, Ryan M. Scheeler, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since October 2017. I am currently assigned to the West Covina Resident Agency Squad 4, which handles the investigation of Counterintelligence matters. I was previously assigned to the West Covina Resident Agency Squad 3, which handles the investigation of violent crimes. My position has vested me with the authority to investigate violations of federal criminal law, to include, but not limited to, bank robbery. Prior to being employed by the FBI as a Special Agent, I was employed by the FBI as a support staff analyst for approximately five years.

2. I received formal training at the FBI Training Academy in Quantico, Virginia as part of New Agent Training, which I graduated from in 2017. During the time I have been employed by the FBI as a Special Agent, I have participated in investigations relating to bank robberies and gang related search warrants.

3. In connection with the bank robbery investigations in which I have participated, I have used a variety of investigative techniques, including interviewing suspects and witnesses, speaking with law enforcement agents and officers, reviewing electronic surveillance, and reviewing physical evidence. As a result of this experience and my conversations

with other law enforcement personnel, I am familiar with the methods used by individuals to commit bank robberies.

## II. PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of

(1) a criminal complaint against and arrest warrant for CHAD NICHOLAS BARKER ("BARKER") for violation of 18 U.S.C. § 1951 (inference with commerce by robbery); and

(2) an application and warrant to search 14817 Ladybird Lane, Victorville CA 92394 (the "SUBJECT PREMISES"), which is believed to be BARKER's residence.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. PREMISES TO BE SEARCHED

6. The premises to be searched is located at 14817 Ladybird Lane, Victorville CA 92394.

## IV. ITEMS TO BE SEIZED

7. The items to be seized, as further described in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1951 (Conspiracy to Interfere with Commerce by Robbery); 18 U.S.C. § 1951

2

(Interference with Commerce by Robbery); and 18 U.S.C. § 924(c) (Brandishing Firearm in furtherance of a Crime of Violence).

## V. STATEMENT OF PROBABLE CAUSE

### A. The December 11, 2017, Fontana robbery

#### 1. The Robbery

8. Based on my review of law enforcement reports and surveillance video, I have learned the following:

    a. On December 11, 2017, at approximately 9:29 p.m., the 7-Eleven, located at 16925 Randall Ave., Fontana, California was robbed by two black males – one of which brandished a handgun. The two robbers took approximately $150 in cash and the two cash drawers from the cash register. The Fontana Police Department ("FPD") responded to the robbery and interviewed a witness who provided the following information:

        i. Employee/witness "S.B." was working in the store when two black males entered the store together, one (believed to be BARKER) wore a red jacket with white stripes on the chest and sleeves with a black hooded sweatshirt underneath, and the other wore a grey hooded sweatshirt. S.B. was in the back of the store when S.B heard the entrance bell ring. S.B. came out of the back and saw the two robbers near the front counter. S.B. said the gunman (believed to be BARKER) placed a water bottle on the counter. One of the robbers asked to buy some cigarettes, and S.B. retrieved the cigarettes and asked the second robber for identification. At this point, the gunman (believed to be BARKER) came around the rear of the counter and pointed a black handgun at S.B. S.B. stated that S.B

3

immediately became afraid for S.B.'s life. The gunman (believed to be BARKER) told S.B. "Open the drawers, just open the drawers." S.B. opened both cash register drawers, the gunman (believed to be BARKER) removed both drawers from the register and handed them to the other robber, and then both robbers exited the store and fled in an unknown direction.

2. BARKER Identified by Latent Prints

9. Surveillance video of the robbery was captured on 7-Eleven's video security system. I reviewed security camera footage from inside the 7-Eleven. I confirmed that the robber in the red jacket, believed to be BARKER, was carrying the water bottle with him around the inside of the store and then placed the water bottle down on the front counter, prior to robbing the store.

10. Immediately after the robbery, FPD collected the water bottle that was placed on the counter by the gunman for a latent print examination and to book into evidence.

11. Latent prints were lifted by FPD from this water bottle on December 13, 2017. On December 19, 2017, the San Bernardino Sheriff's Department ("SBSD") - Latent Print Section processed the latent prints that were lifted from the water bottle.

12. On February 27, 2018, I received a fingerprint analysis results from the SBSD - Latent Print Section from the latent prints on the recovered water bottle. The latent prints found on the water bottle were identified as belonging to BARKER.

4

B. Review of BARKER's Facebook Account

13. On November 21, 2017, the Los Angeles Sheriff's Department ("LASD") obtained a search warrant that was signed and authorized by Superior Court Judge Lori Ann Fournier, Superior County Judge for the State of California, for BARKER's Facebook Account. I reviewed the results of the search warrant, and learned the following:

a. I saw pictures taken of BARKER wearing a red jacket with horizontal white stripes on the chest, white stripes along the sleeves, and a white logo on the upper left chest area. BARKER is also wearing a small, brown, patterned pouch/wallet that hangs from his waist. These items appear identical to the clothing and pouch/wallet worn by the robber in the December 11, 2017 Fontana robbery.

b. I believe based on viewing of BARKER's photographs (i.e. Facebook images and California DMV photo) which shows BARKER's body style, that the gunman from the December 11, 2017 Fontana robbery is BARKER, based on similar body style, clothing, and items worn.

C. Background on the Investigation and the Related Robberies

14. The FBI, along with other state and local law enforcement agencies, is investigating a series of at least 21 commercial crimes robberies (including 7-Eleven convenience stores, liquor stores, and a marijuana dispensary), occurring between April 15, 2017 and May 10, 2017 and then picking back up with the December 11, 2017 Fontana Robbery described above. The

5

robberies follow a similar pattern, namely, two robbers enter the victim-business, confront and point a handgun at the store employee(s), demand money, and take money and/or the cash drawers from the store. Law enforcement has reviewed the surveillance footage from these robberies and determined that they all appear to have at least one robber in common.[1]

15. Below is a list of the additional twenty armed robberies under investigation:

    a.    April 15, 2017 - Jim's Liquor, located at 630 E. Mission Blvd., Pomona, California;

    b.    April 16, 2017 - 7-Eleven, located at 12954 Bess Ave., Baldwin Park, California;

    c.    April 24, 2017 - 7-Eleven, located at 4343 W Slauson Ave., Los Angeles, California;

    d.    April 24, 2017 - 7-Eleven, located at 4111 Venice Blvd., Los Angeles, California;

    e.    April 24, 2017 - 7-Eleven, located at 1075 S Fairfax Ave, Los Angeles, California;

    f.    April 24, 2017 - 7-Eleven, located at 7600 W Sunset Blvd., Los Angeles, California;

    g.    April 24, 2017 - 7-Eleven, located at 4299 S Crenshaw Blvd., Los Angeles, California;

    h.    April 28, 2017 - 7-Eleven, located at 2601 Artesia Blvd., Redondo Beach, California;

---

[1] Simultaneous with the swearing of this Affidavit, law enforcement is also swearing a Complaint and request for an Arrest Warrant for Jimmy Darnell Wheat, Jr. for his role in the May 2, 2017 Glendora robbery and in the broader robbery conspiracy.

6

   i. <u>April 28, 2017</u> – 7-Eleven, located at 3311 W Century Blvd., Inglewood, California;

   j. <u>May 1, 2017</u> – Sami's Liquor, located at 285 N Euclid Ave., Upland, California;

   k. <u>May 2, 2017</u> – 7-Eleven, located at 3705 Puente Ave., Baldwin Park, California;

   l. <u>May 2, 2017</u> – 7-Eleven, located at 105 N Vincent Ave., Covina, California;

   m. <u>May 2, 2017</u> – 7-Eleven, located at 17020 Cypress St., Covina, California;

   n. <u>May 2, 2017</u> – 7-Eleven, located at 5575 Azusa Ave., Azusa, California;

   o. <u>May 2, 2017</u> – 7-Eleven, located at 1410 S Grand Ave., Glendora, California;

   p. <u>May 4, 2017</u> – 7-Eleven, located at 922 W Duarte Rd., Monrovia, California;

   q. <u>May 4, 2017</u> – 7-Eleven, located at 805 W Las Tunas, San Gabriel, California;

   r. <u>May 5, 2017</u> – 7-Eleven, located at 5575 Azusa, Azusa, California;

   s. <u>May 5, 2017</u> – 7-Eleven, located at 9464 Baseline Rd., Rancho Cucamonga, California; and

   t. <u>May 10, 2017</u> – West Adams Collective, located at 4856 W Adams Blvd., Los Angeles, California.[2]

---

[2] Based on an interview with the security guard from this location, BARKER was identified inside the store when the armed robbery occurred.

7

D. **BARKER cellular phone locations**

16. On November 15, 2017, in the State of California - County of Los Angeles, a search warrant was signed and authorized by Superior Court Judge Lori Ann Fournier for BARKER's mobile phone, 760-867-5605, for Call Detail Records ("CDRs") with Cellular Site Locations.

17. The phone company provided subscriber information for the phone and it indicated that it was subscribed to "CHAD BARKER" of Victorville, California.[3]

18. Based on information provided by the phone company, FBI SA Stephen May plotted BARKER's CDRs with historical cellular site data via a third-party vendor software systems. Based on the review of the results, SA May learned the following:

   a. The historical cell site data for BARKER's phone placed BARKER's phone is at or around the areas of the following robberies: April 16, 2017 Baldwin Park robbery; April 24, 2017 Los Angeles (4343 W. Slauson Ave) robbery; April 24, 2017 Los Angeles (4111 Venice Blvd) robbery; April 28, 2017 Inglewood robbery; May 1, 2017 Upland robbery; and May 10, 2017 Los Angeles robbery.

E. **Interstate Commerce**

19. On November 30, 2017, SA May telephonically spoke with Michael Patterson, 7-Eleven Profit Assurance Investigator for

---

[3] The address listed on the subscriber information provided by T-Mobile is "14817 codybird, Victorville CA 92394." Based on my review of Google Maps, there is no street in Victorville, California, named "Codybird."

8

the greater Los Angeles/Western United States. Patterson stated that 7-Eleven is a global organization. Patterson further confirmed the information that is listed on 7-Eleven's website was accurate – "7-Eleven operates franchises and licenses close to 8,500 locations in the United States and Canada, and more than 60,000 stores in 18 countries around the world."

   **F.   Probable Cause to Search the SUBJECT PREMISES**

   20.   Law enforcement has identified the SUBJECT PREMISES as BARKER's residence based on the following:

       a.   I have reviewed a copy of BARKER's California Department of Motor Vehicles record. The record lists the SUBJECT PREMISES as BARKER's address. The record has an application date of July 20, 2016 and is still valid.

       b.   In addition, based on my review of Fontana Police Department reports, I learned that on February 24, 2018, law enforcement conducted surveillance of the SUBJECT PREMISES in order to identify BARKER's residence. Law enforcement were outside the SUBJECT PREMISES for a few hours before they saw BARKER exit the residence and enter a vehicle. After approximately 20-30 minutes, BARKER walked inside the SUBJECT PREMISES. On February 16, 2018, law enforcement observed BARKER exit the SUBJECT PREMISES at approximately 7:00 a.m. Law enforcement observed BARKER re-enter the house twice, as if he forgot something, and, on the final exit, law enforcement observed BARKER locking the SUBJECT PREMISES. Finally, on February 10, 2018, law enforcement observed BARKER arrive at the SUBJECT PREMISES. At this time, law enforcement observed BARKER

9

enter the SUBJECT PREMISES, using keys.

21. Based on my training and experience, and my conversations with senior FBI agents experienced in investigating robberies, I know that persons who commit robberies often store or maintain evidence of their crimes in their homes because those individuals believe it is a safe and secure location under their control, and because the items are easily-accessible. This can include items that have been stolen, or evidence of involvement, such as clothing worn, or tools used, during the commission of the crime.

22. In addition, based on my training and experience, I know that individuals involved in criminal conspiracies frequently communicate with each other on digital devices, such as cellular telephones. Those digital devices may therefore have relevant evidence related to an individual's crime, such as text message communications revealing the planning of such robberies, or future robberies. Further, individuals involved in robbery conspiracies such as this one, often use digital devices to research target locations, directions to target locations, and potential escape routes.

VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

23. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart

10

phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.

11

Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[4] Electronic files saved to a hard drive can be stored for years

---

[4] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

12

with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

  e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital

13

devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a

14

controlled laboratory environment, and also can require substantial time.

  f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

  g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a

15

process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime. In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

24. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. REQUEST FOR NIGHT-TIME SERVICE

25. I further request that the Court authorize investigators, to include other federal and local law enforcement agencies, including but not limited to FBI SWAT and Los Angeles Sheriff's Department Special Enforcement Bureau, to serve these warrants during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii). Good cause exists because BARKER's involvement in an armed robbery and an armed robbery conspiracy, involving firearms possession. Given the holding set forth in Gooding v. United States, 416 U.S. 430 (1974) that there is no need for the presence of exigent circumstances in

narcotics cases to justify a nighttime search, I believe that nighttime service is warranted in this case.

### VIII. CONCLUSION

26. For all the reasons described above, there is probable cause to believe that BARKER has committed a violation of 18 U.S.C. § 1951 (Interference with Commerce by Robbery). In addition, for all the reasons described above, there is probable cause to believe that evidence of violations of 18 U.S.C. § 1951 (Conspiracy to Interfere with Commerce by Robbery); 18 U.S.C. § 1951 (Interference with Commerce by Robbery); and 18 U.S.C. § 924(c) (Brandishing Firearm in furtherance of a Crime of Violence), as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISES, as further described above and in Attachment A of this Affidavit.

/s/
_____
Ryan M. Scheeler, Special Agent
FEDERAL BUREAU OF INVESTIGATION

Subscribed to and sworn before me this ___ day of March, 2018.

PAUL L. ABRAMS
_____
UNITED STATES MAGISTRATE JUDGE

17